UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MARIA P., <br><br> Plaintiff, <br><br> v. <br><br> KILOLO KIJAKAZI, ACTING COMMISSIONER OF SOCIAL SECURITY,[1] <br><br> Defendant. | No. 19 CV 3477 <br><br> Magistrate Judge McShain |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Maria P. brings this action under 42 U.S.C. § 405(g) for judicial review of the Social Security Administration's (SSA) decision denying her applications for benefits. For the following reasons, the Court reverses the SSA's decision, denies the Acting Commissioner of Social Security's (Acting Commissioner) motion for summary judgment [26],[2] and remands this case to the agency for further administrative proceedings.

**Procedural Background**

In March 2016, plaintiff filed a Title II application for a period of disability and disability insurance benefits and a Title XVI application for supplemental security income. [13-6] 230-31, 234-39. Both applications alleged an onset date of February 17, 2016. [*Id.*] 230, 234. The claims were denied initially and on reconsideration. [13-4] 61-84, 87-116. Plaintiff then requested a hearing, which was held by an administrative law judge (ALJ) on March 7, 2018. [13-3] 34-60. In a decision dated June 12, 2018, the ALJ found that plaintiff was not disabled. [*Id.*] 15-27. The Appeals Council denied review on March 23, 2019, [*id.*] 1-4, making the ALJ's decision the agency's final decision. *See* 20 C.F.R. §§ 404.955, 404.981. Plaintiff timely appealed

---

[1] In accordance with Fed. R. Civ. P. 25(d), Kilolo Kijakazi, the Acting Commissioner of Social Security, is substituted as the defendant in this case in place of the former Commissioner of Social Security, Andrew Saul.

[2] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, with the exception of citations to the administrative record [13-1, 13-2, 13-13, 13-4, 13-5, 13-6, 13-7, 13-8, 13-9], which refer to the page numbers in the bottom right corner of each page.

to this Court [1], and the Court has jurisdiction to review the Commissioner's decision under 42 U.S.C. § 405(g).

## Factual Background

Plaintiff, who was forty-nine years and eleven months old on the alleged onset date, *see* [13-4] 73, sought disability benefits based on her left shoulder impingement status post-arthroscopy, right shoulder impingement status post-arthroscopy, myofascial pain syndrome, Chiari I malfunction with mild cervical degenerative disc disease, and obesity. Myofascial pain syndrome is "a chronic pain disorder, in which pressure on sensitive points in the muscles (trigger points) causes pain in seemingly unrelated parts of the body[.]" *Ling Hu v. Colvin*, No. 12 C 9267, 2014 WL 4627746, at *3 n.7 (N.D. Ill. Sept. 15, 2014). A Chiari malformation, in turn, is a "condition in which brain tissue extends into the spinal canal," and symptoms can include "neck pain, unsteady gait, poor hand coordination, dizziness, and numbness and tingling of the hands and feet." *Jennifer L.M. v. Kijakazi*, No. 20 C 338, 2022 WL 375555, at *1 n.2 (N.D. Ill. Feb. 8, 2022) (internal quotation marks omitted).

### A. Left Shoulder

In December 2009, plaintiff injured her left shoulder at work when a 25-pound load that she had been carrying fell back toward her after she placed it on an overhead shelf. [13-8] 400. Plaintiff received physical therapy for her shoulder injury from late December 2009 through late July 2011. [13-8] 369-573. Treatment notes documented persistent pain, significant soreness, and limitations in her range of motion, *see, e.g.* [*id.*] 410, 421, 440, 485, 499, 559, and her discharge report observed that plaintiff's "goal of returning to her premorbid job . . . was not achieved." [*Id.*] 561. Contemporaneously with these physical therapy sessions, plaintiff received treatment for her shoulder pain at M&M Orthopedics from mid-February 2010 through mid-May 2011. [*Id.*] 574-600. Clinical notes documented that plaintiff experienced chronic pain in her shoulder [*id.*] 575, 583-87, 597; that plaintiff had a limited range of motion [*id.*] 574; and that steroid injections were not effective at treating her pain. [*Id.*] 590-92.

From June 22, 2010 through August 15, 2013, plaintiff was treated at Loyola Medicine by several physicians, including orthopedic surgeon Douglas Evans. In October 2010, Dr. Evans diagnosed plaintiff with a left shoulder rotator cuff tear with biceps tendon wear and performed a left shoulder arthroscopy. [13-8] 613. However, plaintiff continued to experience pain in her entire left arm after the surgery. [13-9] 1072. In July 2013, Dr. Evans diagnosed plaintiff with left shoulder partial-thickness supraspinatus tear with continued impingement symptoms. [13-9] 1068. That same month, Evans performed a second left shoulder arthroscopy on plaintiff, as well as a revision subacromial decompression and arthroscopic rotator cuff repair. [*Id.*] 1068-70. Plaintiff returned to AthletiCo for physical therapy after her 2013 surgery, where

2

she had some improvement in her range of motion, but also continued to experience significant pain that interfered with her sleep. [*Id.*] 996-97, 999, 1003.

Plaintiff's last appointment with Dr. Evans was on March 3, 2015. [13-9] 1030. On physical examination, Dr. Evans found that plaintiff "continues to have pain with essentially any range of motion of her shoulder." [*Id.*]. In his treatment note, Evans stated that he would facilitate plaintiff's entry into a "chronic pain program," and that "[a]t this point there is nothing further that I can offer to improve her shoulder pain." [*Id.*].

On October 19, 2015, Dr. Evans prepared a medical source statement in which he opined that plaintiff had permanent restrictions in her ability to lift and carry:

> Maria [P.] has been examined by me on 3/3/2015 and is able to return to work on 3/3/2015 with the following limitations per her FCE [i.e., functional capacity evaluation] on 5/20/2014:
>
> Restrictions per FCE:
> Floor lift no more than 10 lbs occasionally
> Lifting up to level of shoulder no more than 5 lbs occasionally
> Carrying no more than 10 lbs occasionally
> Pull no more than 10 lbs occasionally
> No overhead reaching
> No ladder climbing
>
> **These are permanent restrictions**

[13-9] 1175 (emphasis in original).

### B. Right Shoulder

Plaintiff began experiencing pain in her right shoulder in late 2010. *See* [13-8] 588-89 (Feb. 23, 2011 treatment note in which plaintiff describes "having some right shoulder pain for about 6 months"); *see also* [13-9] 910-11. In June 2011, she underwent right shoulder surgery with Dr. Robert Matlock at Edward Hospital. [13-8] 268. After the surgery, Dr. Matlock diagnosed plaintiff with right shoulder AC joint pain with acromial spur, full-thickness rotator cuff tear, biceps tendon fraying, and mild subscapularis fraying. [*Id.*]. Plaintiff participated in physical therapy for her right shoulder from March 1, 2011 through November 23, 2011. [13-9] 925-72. Treatment notes documented a limited range of motion, pain, and soreness in plaintiff's right shoulder. [*Id.*] 918-20, 929, 933, 938-40.

### C. ALJ's Decision

At step one of her written decision denying plaintiff's applications, the ALJ determined that plaintiff had not engaged in substantial gainful activity since the alleged onset date. [13-3] 18. At step two, the ALJ found that plaintiff had the following severe impairments: left shoulder impingement status post-arthroscopy, right shoulder impingement status post-arthroscopy, myofascial pain syndrome, Chiari I malfunction with mild cervical degenerative disc disease, and obesity. [*Id.*]. At step three, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment. [*Id.*] 18-19.

Before proceeding to step four, the ALJ determined that plaintiff had the residual functional capacity (RFC) to perform light work, which includes the ability to lift up to twenty pounds and the ability to frequently lift and/or carry up to ten pounds. [13-3] 19; *see also* 20 C.F.R. § 404.1567(b) (defining light work). The ALJ included several postural limitations in plaintiff's RFC: she could not climb ladders, ropes, or scaffolds or have concentrated exposure to hazards; she could occasionally crawl; and she could frequently, but not constantly, crouch, kneel, and stoop. [13-3] 19. In determining plaintiff's RFC, the ALJ gave "little weight" to Dr. Evans's opinion that plaintiff's lifting and carrying abilities were permanently limited to floor lifting no more than ten pounds occasionally, lifting to shoulder level no more than five pounds occasionally, and carrying no more than ten pounds occasionally. [*Id.*]. Had the ALJ credited Dr. Evans's opinion and incorporated these restrictions into plaintiff's RFC, plaintiff would have been limited to performing sedentary work, *see* 20 C.F.R. § 404.1567(a) (sedentary work "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools"), and the ALJ would have been required to find that she was disabled as of her fiftieth birthday. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2, Table 1, Rule 201.14; *accord Merri R. v. Kijakazi*, CIVIL NO. 2:21cv298, 2022 WL 1055616, at *12 (N.D. Ind. Apr. 6, 2022).

At step four, the ALJ ruled that plaintiff could not perform her past relevant work as a cook and order picker. [13-3] 24. However, at step five, the ALJ found that there were unskilled jobs within the light exertional range that existed in significant numbers in the national economy that plaintiff could perform, including inspector/hand packager, laundry worker, and small parts assembler. [*Id.*] 25-26. The ALJ accordingly found that plaintiff was not disabled. [*Id.*] 26.

## Legal Standard

Under the Social Security Act, disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted

4

or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

To determine whether a claimant is disabled, the ALJ conducts a five-step inquiry: (1) whether the claimant is unemployed; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairment meets or equals any listed impairment; (4) whether the claimant can perform her past relevant work; and (5) whether the claimant is unable to perform any other available work in light of her age, education, and work experience. *See* 20 C.F.R. §§ 404.1520(a)(4) & 416.920(a). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

The Court reviews the ALJ's decision deferentially to determine if it is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "not a high threshold: it means only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Karr v. Saul*, 989 F.3d 508, 511 (7th Cir. 2021) (quoting *Biestek v. Berryhill*, 139 S. Ct. 1148, 1152 (2019)). But the standard "is not entirely uncritical. Where the Commissioner's decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Brett D. v. Saul*, No. 19 C 8352, 2021 WL 2660753, at *1 (N.D. Ill. June 29, 2021) (internal quotation marks and citation omitted).

## Discussion

Plaintiff argues that the ALJ's decision should be reversed because the ALJ erred in evaluating the opinion of Dr. Evans, her treating orthopedic surgeon. Plaintiff contends that the ALJ misapplied, or failed to apply, the factors set forth in 20 C.F.R. § 404.1527(c) for determining the weight to be given to a treating physician's opinion. [19] 6-12. For the reasons set forth below, the Court concludes that the ALJ did not give good reasons for assigning less than controlling weight to Dr. Evans's opinion, and that the ALJ did not adequately discuss the factors in § 404.1527(c) when she weighed that opinion. Accordingly, the ALJ's decision must be reversed, and this case will be remanded to the agency for further proceedings.[3]

### A. Treating Physician Rule

"Social Security regulations direct an ALJ to evaluate each medical opinion in the record." *D.K.H. v. Saul*, No. 19-cv-7755, 2021 WL 2566768, at *3 (N.D. Ill. Jun. 23, 2021) (citing 20 C.F.R. § 416.927(c)). "Because of a treating physician's greater familiarity with the claimant's condition and the progression of his impairments, the

---

[3] Given this ruling, the Court need not address plaintiff's argument that the ALJ's decision should be reversed because the ALJ improperly discounted plaintiff's subjective allegations.

5

opinion of a claimant's treating physician is entitled to controlling weight as long as it is supported by medical findings and is not inconsistent with other substantial evidence in the record." *Id.*

As the Seventh Circuit has explained, "[a] treating physician's opinion on the nature and severity of a medical condition is entitled to controlling weight if it is well supported by medical findings and is consistent with other evidence in the record." *Gerstner v. Berryhill*, 879 F.3d 257, 261 (7th Cir. 2019). "When controlling weight is not given, an ALJ must offer 'good reasons' for doing so, after having considered: (1) whether the physician examined the claimant, (2) whether the physician treated the claimant, and if so, the duration of overall treatment and the thoroughness and frequency of examinations, (3) whether other medical evidence supports the physician's opinion, (4) whether the physician's opinion is consistent with the record, and (5) whether the opinion relates to the physician's specialty." *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016); *see also* 20 C.F.R. § 404.1527(c)(2).[4]

The ALJ provided the following explanation for her decision to give little weight to Dr. Evans's opinion that plaintiff had permanent restrictions that limited her to only occasionally lifting and carrying no more than 10 pounds:

> I assigned little weight to the opinion of Dr. Evans. In so doing, I note that while Dr. Evans was a treating source physician, he did not treat the claimant after the alleged onset date. In addition, his opinion is based upon a functional capacity evaluation from nearly two years prior to the alleged onset date, which is not within the record. On a related note, the most recent diagnostic testing (CT Scan and electromyography/nerve conduction study), which is from the remote past, fails to establish a clear etiology for the claimant's subjective complaints of pain and limitation. In fact, in July 2014, [Dr. Evans] indicated that he felt it was unlikely the claimant's subjective complaints of pain were entirely attributable to her shoulder; and in March 2015, Dr. Evans noted that upon referral for possible surgical treatment of her os acromiale, a specialist stated that he did not feel that this was medically necessary or would help her.

[13-3] 22 (internal record citations omitted).

The Court concludes that the ALJ did not give good reasons for assigning less than controlling weight to Dr. Evans's opinion as to plaintiff's lifting and carrying restrictions.

---

[4] The SSA has modified the treating physician rule to eliminate the "controlling weight" instruction for claims filed on or after March 27, 2017. *D.K.H.*, 2021 WL 2566768, at *3 n.2. Because plaintiff filed her applications before that date, the Court applies the prior version of the treating physician rule.

6

### 1. Pre-Onset Evidence

First, "medical evidence predating a claimant's onset date is not categorically irrelevant to a finding of disability." *Clayborne v. Astrue*, No. 06 C 6380, 2007 WL 6123191, at *5 (N.D. Ill. Nov. 9, 2007). To the contrary, the ALJ must "consider all evidence in the case record when [she] makes a determination or decision whether the claimant is disabled, including evidence that predates a claimant's alleged onset date." *Robert M.W. v. Saul*, Case No. 19 C 3165, 2020 WL 6801842, at *5 (N.D. Ill. Nov. 19, 2020) (internal quotation marks and some internal brackets omitted). Whether medical records or opinions predate the claimant's alleged onset date is something the ALJ can consider, but that fact "alone does not automatically render them outdated." *Mowatt v. Colvin*, No. 15 C 5521, 2016 WL 3951626, at *7 (N.D. Ill. Jul. 21, 2016); *see also Croffoot v. Colvin*, No. 14 CV 50159, 2016 WL 1407736, at *5 n.5 (N.D. Ill. Apr. 11, 2016) (although some medical records "predate Plaintiff's alleged onset date in 2007," the court "still finds these records relevant because the alleged injury causing Plaintiff's knee and back impairments occurred in 2001"). If a medical record from before the alleged onset date "indicates that the [claimant's] restrictions are permanent," it is "even more important for the ALJ to discuss why that finding by a treater was not given controlling weight." *Mowatt*, 2016 WL 3951626, at *7.

Most critically in this case, there is no indication in the ALJ's decision that she considered the permanent nature of the limitations identified by Dr. Evans. Rather, the ALJ emphasized–as does the Acting Commissioner–that Evans did not treat plaintiff "after the alleged onset date," and that his opinion was based on a functional capacity evaluation "from nearly 2 years prior to the alleged onset date." [13-3] 22; *see also* [27] 2 (Acting Commissioner's argument that "most obvious reason" to reject Evans's opinion was that it "preceded the relevant period"). The ALJ's emphasis on the date of Evans's opinion implies that the ALJ believed that it was outdated, but the mere fact that Dr. Evans rendered his opinion before the onset date "does not automatically render [it] outdated." *Mowatt*, 2016 WL 3951626, at *7. And "[b]y its very nature"–a "permanent" limitation in plaintiff's ability to lift and carry–"there is no reasonable basis upon which to infer that the restriction" opined by Dr. Evans "somehow expired prior to [plaintiff's] alleged onset date." *Fike v. Astrue*, Cause No. 1:11-CV-168, 2012 WL 1200670, at *8 (N.D. Ind. Apr. 10, 2012) (failure to consider pre-onset opinion permanently forbidding repetitive use of right arm was reversible error). "Indeed, if the ALJ was uncertain about the applicability of [Evans's] 'permanent restriction' to the relevant time period, she could have contacted him to request additional clarification." *Id.*

Relatedly, the ALJ did not identify a substantial basis in the evidence that could support a finding that plaintiff's condition had significantly improved after the treating relationship between plaintiff and Dr. Evans ended. The ALJ cited to a treatment note prepared by Dr. Kevin Orr, who evaluated plaintiff at the Loyola Pain

7

Medicine Clinic on May 19, 2015–barely two-and-a-half months after plaintiff's last appointment with Dr. Evans. [13-9] 1169-73. Dr. Orr found that plaintiff retained flexion and abduction in both arms to 120 degrees. [13-9] 1171. Plaintiff also told Orr that her pain was "better" when she took Aleve. [*Id.*] 1169. Yet Dr. Orr's treatment note also documented that plaintiff still experienced pain when performing the flexion and abduction exercises; it also recorded plaintiff's statement that her "pain has been getting worse steadily." [13-9] 1169, 1171. Unlike Dr. Evans, moreover, Dr. Orr did not translate his findings into work-related limitations. [*Id.*] 1169-72. It is therefore unclear how this treatment note could support a finding that plaintiff's condition had materially improved, such that the ALJ could plausibly conclude that Dr. Evans's opinion about plaintiff's ability to lift and carry was outdated. *Cf. Clayborne*, 2007 WL 6123191, at *5 (recognizing that probative value of pre-onset medical evidence "may be significantly lessened when it is at odds with medical evidence collected after the claimant's onset date").

### 2. Reliance on State Agency Medical Consultants

Second, there is no merit to the Acting Commissioner's argument, *see* [27] 2-3, that the ALJ's decision to give "great weight" to the opinions of the non-examining State agency medical consultants–both of whom opined that plaintiff could perform light work, *see* [13-3] 23–constitutes a good reason for giving less than controlling weight to Dr. Evans's opinion. "An ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Vanprooyen v. Berryhill*, 864 F.3d 567, 573 (7th Cir. 2017) (internal quotation marks omitted).

### 3. Etiology of Plaintiff's Pain

Third, the Court rejects the Acting Commissioner's argument that the ALJ reasonably discredited Dr. Evans's opinion because he "could not establish a medical cause of plaintiff's pain and thus took her allegations of pain at face value." [27] 5. At the outset, the Acting Commissioner's argument ignores the fact that Dr. Evans expressly based his opinion respecting plaintiff's lifting and carrying limitations on a functional capacity evaluation that was performed in May 2014. [13-9] 1175.[5] In any event, as the Acting Commissioner notes, Dr. Evans stated in a July 2014 treatment note that he believed it was "unlikely that all of these pains were related to her shoulder." [13-9] 1046. But the fact that Dr. Evans could not identify what was causing all of plaintiff's pain does not mean there was no medically determinable basis for some or even most of her pain, and by no means does it support the Acting Commissioner's claim that Dr. Evans was just taking plaintiff's word for it. "As countless cases explain, the etiology of extreme pain often is unknown, and so one can't infer from the inability of a person's doctors to determine what is causing her

---

[5] Presumably Dr. Evans's opinion was also informed by having treated plaintiff for several years and performed two of her shoulder surgeries.

8

pain that she is faking it." *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010). More fundamentally, the record as a whole completely negates the implications of the Acting Commissioner's argument: that plaintiff was a malingerer or that there was no medically determinable basis for her chronic pain. Plaintiff was diagnosed with–and the ALJ found that she suffered from–one chronic pain syndrome (myofascial pain syndrome), she was diagnosed with–and the ALJ found that she suffered from–another impairment that could be expected to cause neck pain (Chiari I malfunction), she underwent three shoulder surgeries during a three-year period in an attempt to alleviate her shoulder pain, and she participated in years of physical therapy sessions before and after those surgeries hoping to recover her pre-injury range of motion. To say, as the Acting Commissioner does, that Dr. Evans could opine on plaintiff's lifting and carrying abilities only by taking plaintiff at her word is a gross distortion of the record.

### 4. Failure to Explain Need for Restrictions

The Acting Commissioner also maintains that the ALJ properly discounted Evans's opinion because he did not "support his restrictive limitations with an explanation or treatment notes." [27] 3. However, the ALJ said nothing about Dr. Evans's alleged failure in this regard, *see* [13-3] 22-23, and such a conclusion would be impossible to square with the ample medical record generated during the nearly five-year treating relationship between Dr. Evans and plaintiff, and the fact that Evans based the restrictions on plaintiff's May 2014 functional capacity evaluation. [13-9] 1175.

### 5. Inconsistencies in Treatment Records and Pursuit of Conservative Treatment

Nor is there merit to the Acting Commissioner's argument that the supposed "internal inconsistencies" in Dr. Evans's treatment records, and the fact that plaintiff pursued only conservative treatment after the alleged onset date, provided good reasons to discount Evans's opinion. [27] 3-4. According to the Acting Commissioner, the ALJ found that Dr. Evans's opinion on plaintiff's lifting and carrying restrictions was inconsistent with his statement that "plaintiff's left shoulder impairment was not the likely cause of her significant amount of complaints." [*Id.*] 3. But this argument is just a repackaging of the Acting Commissioner's misguided contention that Dr. Evans's opinion was not credible because he did not identify a clear etiology of plaintiff's pain. Likewise, plaintiff's pursuit of conservative treatment after the alleged onset date is consistent with Dr. Evans's opinion that, after several years of examining her and performing two surgeries on her left shoulder, there was "nothing further that [he] can offer to improve her shoulder pain." [13-9] 1030. The fact that plaintiff did not seek out aggressive treatment after the onset date–including "possible surgical treatment of her os acromiale," which even the ALJ recognized was

9

not "medically necessary" and unlikely to "help [plaintiff]"–in no way constitutes a good reason to reject Dr. Evans's opinion.

### 6. Inadequate Discussion of § 404.1527(c)(2) Factors

Finally, even if the ALJ had given a good reason for affording less than controlling weight to Dr. Evans's opinion, the ALJ did not adequately discuss the factors that determine what weight should be afforded to his opinion. The ALJ recognized that Dr. Evans was a treating source, but she did not discuss "the length and nature of the treatment relationship Plaintiff had" with Dr. Evans. *D.K.H.*, 2021 WL 2566768, at *3 (reversing ALJ's decision for failure to adequately discuss same factor). Dr. Evans regularly examined plaintiff over a nearly five-year period, and he performed two of her three shoulder surgeries. Nor did the ALJ consider that Evans's specialty was orthopedic surgery, which gave him "specialized knowledge regarding Plaintiff's conditions and their effect on [her] functional capacity." *Id.* Finally, it is unclear to what extent, if at all, the ALJ considered the supportability of Dr. Evans's opinion. The ALJ did not undertake any detailed review of Evans's treatment notes. *See* [13-3] 20-23. Rather, the ALJ appears to have dismissed Dr. Evans's opinion, not only (and erroneously) because it predated plaintiff's alleged onset date, but also because the functional capacity evaluation on which it was based was not in the record. But if the ALJ thought that she needed to see the functional capacity evaluation itself before she could properly weigh Dr. Evans's opinion, she should have contacted Dr. Evans or made an effort to obtain the evaluation. *Cf. Chestine G. v. Saul*, Case No. 18 C 4980, 2020 WL 1157384, at *13 (N.D. Ill. Mar. 10, 2020) ("An ALJ may recontact a medical source if she is unable to render a decision because the evidence is insufficient or inconsistent."). More to the point, Dr. Evans expressly opined in a July 22, 2014 treatment note that "the functional capacity evaluation is valid," and he imposed corresponding restrictions on that basis. [13-9] 1090. This was significant evidence of the supportability of Dr. Evans's opinion, which the ALJ needed to address.

Because the ALJ misapplied the treating physician rule when she evaluated Dr. Evans's opinion respecting plaintiff's permanent lifting and carrying restrictions, this case must be remanded for further proceedings.

## Conclusion

For the reasons set forth above, plaintiff's request to reverse the SSA's decision and remand this case to the agency [19] is granted, and the Acting Commissioner's motion for summary judgment [26] is denied. The decision of the SSA is reversed, and, in accordance with the fourth sentence of 42 U.S.C. § 405(g), this case is remanded for further proceedings consistent with this Memorandum Opinion and Order.

**HEATHER K. McSHAIN**
**United States Magistrate Judge**

**DATE: May 13, 2022**